1

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF GEORGIA
2                 STATESBORO DIVISION

3


4    UNITED STATES OF AMERICA,      :
                                    :
5       v.                          :
                                    :   CASE NUMBER CR-6:15-00005
6    JOSEPH DEAN GARCIA,            :
                                    :
7          Defendant.               :
    ─────────────────────────────

8

9

10

11

12                  SENTENCING HEARING

13      BEFORE THE HONORABLE LISA GODBEY WOOD
             United States Courthouse
14              52 North Main Street
               Statesboro, Georgia
15              December 16, 2015

16

17

18

19

20  ──────────────────────────────────────────

21   COURT REPORTER:   Victoria L. Root, CCR
                       United States Court Reporter
22                     Post Office Box 10552
                       Savannah, Georgia  31412
23                     (912) 650-4066

24

25      (Proceedings taken down by mechanical stenography and
        transcribed using computer-aided transcription.)

2

1                         A P P E A R A N C E S

2


3    FOR THE GOVERNMENT:

4        LAMONT A. BELK, Esquire
         Assistant United States Attorney
5        Post Office Box 2017
         Augusta, Georgia  30903
6        (706) 724-0517

7


8    FOR THE DEFENDANT:

9        PAGE A. PATE, Esquire
         Pate & Johnson, LLC
10       101 Marietta Street, Suite 3300
         Atlanta, Georgia  30303
11       (404) 223-3310

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                              I N D E X

2                                                                    Page

3    I.      PRELIMINARIES . . . . . . . . . . . . . . . . . .      4

4
     II.     FINDINGS OF FACT AND CONCLUSIONS OF LAW . . . . .      5
5

6    III.    ARGUMENT BY MR. PATE IN MITIGATION OF
                 SENTENCE. . . . . . . . . . . . . . . . . . .      7
7

8    IV.     ARGUMENT BY MR. BELK AS TO SENTENCE . . . . . . .     14

9
     V.      STATEMENT BY THE DEFENDANT. . . . . . . . . . . .     19
10

11   VI.     PRONOUNCEMENT OF SENTENCE . . . . . . . . . . . .     24

12
     VII.    CERTIFICATE OF REPORTER . . . . . . . . . . . . .     30
13

14

15                              -oOo-

16

17

                              E X H I B I T S
18

| EXHIBIT NUMBER | DESCRIPTION | MARKED/IDENTIFIED |
| --- | --- | --- |
| Court's 1 | Wedding photograph | 22 |
| Court's 2 | Letters from victims | 22 |

22

23

24

25

4

P R O C E E D I N G S

1

2       (Call to order at 11:56 a.m.)

3           THE COURT:  All right, Ms. Mixon.  The defendant is

4   present, if you'll call the next case.

5           COURT CLERK:  *United States of America v. Joseph Dean*

6   *Garcia*.  Lamont Belk for the Government.  Page Pate for the

7   Defense.

8           MR. BELK:  Your Honor, the Government is ready.

9           MR. PATE:  We are ready as well.  Thank you.

10          THE COURT:  All right.  Mr. Pate, approach with your

11  client, Mr. Joseph Dean Garcia.

12      (Counsel and Defendant approached the lectern.)

13          THE COURT:  All right.  Mr. Garcia, you appeared

14  before me on September 14th, 2015, accompanied by your

15  attorney, Mr. Pate, for your Rule 11 proceeding.  And pursuant

16  to a plea agreement, you pled guilty and were adjudged guilty

17  of Count 1 of the information charging you with conspiracy to

18  commit wire fraud in violation of 18 U.S.C. Section 371.

19          Upon completion of that Rule 11 proceeding and my

20  acceptance of your guilty plea, I directed the probation office

21  to prepare a presentence report and to disclose that report to

22  the Defense and the Government.

23          Now, Mr. Garcia, have you had the opportunity to read

24  and review that report and its brief addendum and talk about it

25  with Mr. Pate?

5

1          THE DEFENDANT:   Yes, Your Honor.

2          THE COURT:   And are there any objections as to

3    either the factual accuracy of the report or to the probation

4    officer's application of the advisory sentencing guidelines?

5          MR. PATE:   Not at this time, Your Honor.   We did have

6    one objection, but it was resolved.

7          THE COURT:   All right.   And, Mr. Belk, on behalf of

8    the Government?

9          MR. BELK:   No objections from the Government,

10   Your Honor.

11         THE COURT:   All right.   There being no objections to

12   the factual statements contained in that presentence report,

13   I'll adopt those as my statements of fact.

14         There being no objection to the probation officer's

15   conclusions about the advisory guidelines, I'll adopt those

16   conclusions and therefore determine, in Mr. Garcia's case, the

17   applicable advisory guidelines are a total offense level of 19,

18   criminal history category of 1.   The advisory range is 30 to

19   37 months of imprisonment, 1 to 3 years of supervised release,

20   6,000 to $60,000 fine, restitution in the amount of $635,000, a

21   $100 special assessment.   As to the statutory penalty involved

22   for Count 1, there's no minimum, and there's a maximum of

23   5 years of imprisonment.

24         Mr. Belk, before I turn to the Defense and then back

25   to the Government, are there any victims who are present and

6

1    wish to make a statement regarding the impact, financial or

2    otherwise, that this offense has had on them?

3            MR. BELK:  Yes, Your Honor.  We do have Ms. Rebecca

4    Norman present.  She's in the courtroom.  I understand,

5    however, she does not wish to address the Court, but we do

6    acknowledge her presence.

7            THE COURT:  All right.  Thank you.

8            And I will say on the record that I have received

9    certain materials for consideration prior to coming here.  And

10   I believe I did receive one letter from a victim, and I have

11   received letters from the defendant's family as well.  And I've

12   also received access to a video that was made by two of the

13   defendant's children.

14           And I did have the opportunity to read and -- those

15   letters that I received as well as watching that video that

16   was made available by Mr. Pate for me to review.  Specifically,

17   that was the video that was set forth in a park in New Mexico.

18           I also received a letter from Arlene Paglia; from

19   Chance Paglia, who I also saw; and Janine Paglia; as well as

20   Mason Paglia, who also . . .

21           Well, let me turn to you, Mr. Pate.  Is there any

22   evidence you'd like to bring forth or witnesses you'd like to

23   call or argument you'd like to make in mitigation?

24           MR. PATE:  Yes, Your Honor.  We certainly do have

25   some argument that I'd like for the Court to consider in terms

1    of a reasonable sentence.  We have no additional evidence to

2    present.  I wanted to make sure the Court has an opportunity --

3    or had an opportunity to review the character letters and the

4    video that we provided to the Court.  But other than that, it

5    would just be my argument.

6              THE COURT:  All right.  If you'll proceed.

7              MR. PATE:  Thank you, Your Honor.

8              As I noted earlier, we did have an initial objection

9    to the presentence investigation report, but that has been

10   resolved, and so we agree that the advisory guideline range is

11   between 30 and 37 months.

12             We note that the probation office has recommended the

13   high end of that guideline range, I think primarily, from what

14   I can tell, based on the argument that the criminal history

15   category here may be somewhat understated because Mr. Garcia

16   does have some prior convictions.  They are very old.  Most

17   occurred when he was a very young man.  And so, by the rules

18   that we have in our guidelines, they don't count towards the

19   sentence.  And that's, you know, why we have rules in the

20   guidelines.

21             But I think it's important to note for the Court

22   that, you know, I've had certain, I guess, personal impressions

23   or professional impressions about Mr. Garcia in -- and these

24   kinds of cases in general.  You know, having done this for over

25   20 years now, I've had my share of fraud cases.

8

1          And when I read the probation officer's

2  recommendation and some of the facts stated in the PSR, I think

3  there's a general impression that perhaps the Government,

4  perhaps other individuals have about the type of a defendant --

5  or the general type of a defendant in a fraud case.  We call

6  them fraudsters.  And it seems that, at least in my experience,

7  there's a particular personality trait or a demeanor to some of

8  these individuals that's consistent in a lot of these different

9  cases.

10          In my experience, when I have a defendant in a case

11  like this, it is customary for them to minimize, deflect from

12  the very beginning of the case, even all of the way through

13  sentencing.  While they may, at some point, recognize and

14  accept the need to enter a guilty plea or accept

15  responsibility, they do it very reluctantly, and it becomes

16  almost painful, from the defense standpoint, to help them get

17  through that process.

18          That's not true with Mr. Garcia.  From my very first

19  meeting with him, he immediately accepted responsibility for

20  what he did in this case.  And I sat down with him and --

21  frankly, reviewing the discovery, we went through all of the

22  telephone conversations that Omega, as a company, had with the

23  victims in the case.  We went through the e-mails.  We went

24  through how the scheme was developed.

25          Mr. Garcia's name was not on any of that.  He wasn't

1    the guy on the phone.  He wasn't the guy in the e-mails.  He

2    wasn't the person that came up with the idea of the scheme.  He

3    didn't create these personalities.  At no time did he ever

4    deny, though, that he was a beneficiary of it.  He, in some

5    ways, was an instigator of it.

6          But this was a defensible case because, other than

7    the fact he received some money, there was really no direct

8    evidence tying him to the fraud scheme and the alleged victims

9    in the case.  They couldn't come forward and say, "This is the

10   guy I talked to who told me X, Y, and Z," or, "This is the

11   person that I trusted my money to."  He simply had no contact

12   with those individuals.

13         And I explained that to him, and I said, "You know,

14   in a case like this, it all depends on whether the Government

15   can follow the money trail but then also show that you had

16   knowledge of the fraudulent conduct.  The fact that you

17   benefited is not enough.  You have to be benefit and be aware

18   of the ongoing criminal conduct."

19         THE COURT:  And, of course, sometimes, others

20   involved in the criminal conduct would weigh in to tie him

21   to --

22         MR. PATE:  Of course.

23         THE COURT:  -- other events.

24         MR. PATE:  Of course.  And perhaps that would have

25   happened at the end of the day.  But initially, that was not a

1    concern of ours.

2           But he had no part of that.  He wanted no part of

3    that.  He said, "I was involved.  I got this money.  These

4    people are out of this money.  I want to plead guilty."  And

5    that was one of the first conversations I had with him.

6           And so we went forward and negotiated with the

7    Government a plea agreement that we thought was fair

8    considering the circumstances and the facts of the case.

9    To the extent it was possible for Mr. Garcia to help with

10   restitution, he did so.

11          He has been willing to surrender his interest in a

12   joint account that he and his wife -- or soon-to-be ex-wife

13   control.  He's always been willing to do that.  Logistically,

14   it's somewhat difficult.  He's in custody.  He doesn't have

15   access to that account.

16          His ex-wife surrendered some money that, frankly, I

17   don't know was actually tied to the offense conduct in this

18   case.

19          But Mr. Garcia said, you know, "Government wants it.

20   Give it to the Government."

21          They also took some money from him at the time that

22   he voluntarily surrendered.  And I go back to that.  He did,

23   in this case -- once he became aware of the indictment, he

24   flew to the Southern District of Georgia at my request and his

25   agreement and --

1    THE COURT:   About the money, remind me:   The

2    legitimate source of money that he had was?

3    MR. PATE:   He was working after the Omega investment

4    scheme ended.   And I think the actual scheme itself, the

5    offense --

6    THE COURT:   And where was that job?

7    (Defense Counsel and Defendant conferred.)

8    MR. PATE:   His employment right before he was

9    arrested, that was in Washington, D.C.

10    THE COURT:   And what -- who was that for?

11    MR. PATE:   He had worked for a couple of different

12    law firms in the D.C. area.   And I reached out to one of those

13    individuals -- I believe Probation did as well -- and they did

14    verify that he did do some work for that firm.   I don't think

15    that's an issue in the case.

16    THE COURT:   So his legitimate source of these funds

17    would have been that work that he did with one of those law

18    firms after Omega right before he was arrested?

19    MR. PATE:   Your Honor, my point was that -- the

20    money from his ex-wife, I don't know that that even came from

21    Mr. Garcia.   I'm not suggesting that he was trying to hold on

22    to any money himself.   I'm simply saying at no point did he

23    ever try to obstruct the Government from taking assets away

24    from either him --

25    THE COURT:   That weren't his.   Oh, I see what you're

1  saying.  At least he didn't stop other people from trying to

2  pay the victims.  Okay.

3              MR. PATE:  From surrendering money to the Government.

4              THE COURT:  Okay.  All right.

5              MR. PATE:  I mean, I don't know the source of those

6  funds.  I haven't spoken with Ms. Paglia about it.

7              THE COURT:  Right.  But I guess he didn't stand in

8  the way with other people trying to --

9              MR. PATE:  He did not --

10             THE COURT:  -- pay?

11             MR. PATE:  -- no.

12             THE COURT:  Okay.  All right.

13             MR. PATE:  And I think, if he had the money available

14  to him, he would have provided it.

15             THE COURT:  Okay.

16             MR. PATE:  I do know that early on in the case when

17  there was a suggestion that the money that had been developed

18  post the offense conduct was somehow obtained fraudulently,

19  that money was also voluntarily returned --

20             THE COURT:  All right.

21             MR. PATE:  -- without any Government involvement.

22             So he's been in custody since the time he voluntarily

23  surrendered.  I think we're now about 10 months into that

24  custody.  Obviously, he's not been at a federal prison camp

25  during that period of time.  He's been in local jails.  He's

1   also been at several different BOP facilities for purposes of
2   mental evaluation and tests.  He's gone through that process.
3        Having watched him over the past 10 months or so and
4   met with him the number of times that I have, it's clear that
5   either the case or his custody or the circumstances of all of
6   that combined has had a very -- I think personally, just from
7   my professional observations of him, a significant impact on
8   his mental health and emotional health.
9        You know, I've seen a trajectory straight downward,
10  especially over the last several months.  I know he's indicated
11  to me -- and perhaps he'll indicate to the Court -- that he is
12  interested in participating, again, to the extent he can, with
13  any mental health treatment program within the BOP.  I think
14  the Court has the ability to recommend that, and perhaps the
15  BOP would do that on its own.  I think he's willing and anxious
16  to do that as well.
17       Looking at the range between 30 and 37 months, I do
18  note that the loss amount in the case is certainly closer to
19  the lower end of the segment or the loss category that puts us
20  into 30 to 37 months.  I think that starts at around half a
21  million dollars.
22       We're at 650-something in this case, and it goes up
23  to a million and a half, so he's in the same range as if the
24  fraud conduct had taken over a million dollars when, in fact,
25  the amount here is towards the low end of that.

1          In many cases, I will stand before the Court, and

2     I'll suggest that a reasonable sentence would be a sentence

3     that varies from the guideline range -- the advisory guideline

4     range.  I'm not doing that in this case.  I think, given the

5     facts and given the history, even though it doesn't count on

6     the guidelines, it's certainly something that the Court can

7     take into account.

8          But I do believe that -- based on the facts of the

9     offense conduct, what he's pled to, what is in the PSR, and the

10     numbers, I do think the low end of the advisory guideline range

11     is appropriate, and so that is what we're requesting in this

12     case.

13          THE COURT:  All right.  Mr. Belk, on behalf of the

14     Government.

15          MR. BELK:  Thank you, Your Honor.

16          THE COURT:  And -- let's see.  Mr. Pate and

17     Mr. Garcia, if you'll have a seat.  Thank you.

18          MR. BELK:  Your Honor, let me first state that we did

19     receive additional correspondence from some of the victims in

20     this case.  I do have copies for the benefit of Your Honor, if

21     I may approach.

22          THE COURT:  And I would like to take that into

23     consideration.  So if you'll provide those to me and a copy to

24     the Defense as well, and those will become part of this record.

25     And, Mr. Belk, hold on just a second so I can read those.

1      (A pause in the proceedings from 12:12 p.m. to 12:15 p.m.)

2           THE COURT:  All right.  I have had the opportunity to

3      study those letters.

4           MR. BELK:  And thank you, Your Honor.  And the

5      Court would note that one of the missives included is from

6      Ms. Norman, who is present today.

7           Your Honor, I would just state from the outset that,

8      in this case, there is certainly no reason to downwardly depart

9      or sentence the defendant at the lower end of the guideline

10     range.  And I believe there's compelling reasons for that.

11          As the PSI notes, this case involves the defendant's

12     lifelong pattern of fraud and deceit.  In this case, his first

13     scheme involved Omega Consulting -- Omega Capital

14     Consultants -- excuse me -- and the scheme, as far as we can

15     tell, started as early as August of 2009.  That was within a

16     year of his completing his felon -- last felony sentence, which

17     ended in January of 2009.

18          He has a lengthy and significant criminal history,

19     one that shows his repeated disregard for the law, beginning at

20     the age of 17.  He is now 49 years old.  He has five prior

21     felony convictions, all of which involve the same type or form

22     of criminal activity: theft, fraud, embezzlement, and the like.

23          As a result, he has experienced nearly the entire

24     spectrum of sentences available to the courts.  He's been

25     sentenced by state courts.  He's been sentenced by a federal

1   court.  He's been to prison.  He's been placed on probation.

2   He has been revoked.  He has been to state prison, and he's

3   been to federal prison.  Nothing has deterred or altered his

4   conduct in any way, shape, or form.  So his criminal history

5   alone is very compelling.

6           I would just point out in even more detail, if you'll

7   look at his history, Your Honor, just a couple points.  His

8   first felony offense involving fraud occurred in 1985.  And

9   apparently, while out on bond on that case, he then incurs

10  another felony offense involving fraud, larceny, and forgery;

11  so he's placed on probation for that second offense.  And

12  then while on probation, he commits a federal felony offense

13  involving passport fraud.

14          And then while still on probation for the earlier

15  offenses, he commits a -- an embezzlement along with some

16  other charges in 1990.  And while he was still out on federal

17  prison -- and then we look at the last offense, which occurred

18  in 2002.  And he was sentenced in 2005.  He was placed on

19  4 years' probation.

20          His last offense occurred when he was at the age of

21  35.  Again, his first offense was at the age of 17.  And he was

22  well into his 40s when this activity occurred.  So we show a

23  consistent pattern of criminal activity with this defendant.

24          But that's not all.  By his own admission, if you

25  look at Paragraph 60 of the PSI, which is not in dispute, he

1   admitted to a federal court that he is, in fact, a pathological

2   liar.  And that's consistent with the criminal activity that we

3   have before the Court today.

4            He also claims to have been self-employed during his

5   entire adult life but yet simply cannot provide dates or

6   verification of income.  He can't verify any legitimate

7   income, essentially, during the past 32 years if you look at

8   Paragraphs 65 and 68 of the PSI.

9            There are representations that he worked for various

10  firms and the like -- he was a welder and so on and so forth --

11  but nothing to corroborate that information.  So we can only

12  assume, I think safely assume, that he has been involved in

13  criminal activity for the better part of his adult life.

14           At the time of his arrest, notwithstanding his

15  lack of verifiable, legitimate income, he and his wife and --

16  ex-wife and two sons were living in a fairly upscale

17  neighborhood in the nation's capital, renting a home at the

18  price of $12,500 per month consisting of over 7,200 square

19  feet, again, with no verifiable, legitimate income.  And,

20  again, that would reference to Paragraph 72 of the PSI.

21           I would say, Your Honor, that this case presents

22  essentially a snapshot of his criminal activity.  I believe

23  that is a very safe assumption based on the evidence before the

24  Court.

25           I would also point out for the Court that the

1    defendant did receive a significant benefit in this case.   By

2    virtue of the plea agreement, he was allowed to plead to the

3    conspiracy -- the 18 U.S.C. Section 371 conspiracy, which did

4    limit his exposure to 60 months, which is the maximum penalty.

5             And I will say -- essentially, I guess one of the

6    best things we could say about this defendant is that when he

7    is caught, when he is apprehended, he does admit his conduct,

8    as Mr. Pate admitted.

9             I would take a different point of view.   I would

10   suggest to the Court that the defendant probably sees this as

11   essentially the cost of doing business, if you will.   His

12   criminal history suggests that.   He's also spent a great deal

13   of time outside of prison obviously amassing, through various

14   means, illicit, I would suggest, wealth and so forth.

15            But having said all that, Your Honor, the -- we do

16   believe that the 30- to 37-month range is appropriate as

17   calculated.   It does reflect the seriousness of the offense as

18   well as his prior history.

19            But having said that, I believe if Your Honor

20   fashions a sentence, at the very least, at the high end of the

21   range, it would promote respect for the law and act as a

22   deterrence for others.

23            And having said that, Your Honor, I'll leave it to

24   Your Honor's discretion.

25            THE COURT:   All right.   Thank you, Mr. Belk.

1          All right.  Mr. Pate and Mr. Garcia, reproach.

2       (Counsel and Defendant approached the lectern.)

3          THE COURT:  Mr. Garcia, it is your opportunity to

4   address me last.

5          Is there anything you would like to say with regard

6   to sentencing before I pronounce sentence?

7          THE DEFENDANT:  As the Courts have stated,

8   Your Honor, I don't think I'm going to say anything that

9   anyone's going to believe anyway.  And I do have a problem with

10  lying.  I always have.  That's no excuse.  I'm not trying to

11  excuse my behavior.

12         I've been in and out of prisons my whole life.  I've

13  been in trouble in some capacity.  I get in trouble; I stay out

14  of trouble for as long as I possibly can; and then I end up in

15  trouble.

16         I've done a lot of soul searching.  I believe that

17  within each increment of trouble that I get into, I seem to

18  widen the space a little bit.  I certainly hope I can widen the

19  gap on this one much, much larger.

20         And I intend to -- I've never sought out counseling

21  in terms of psychological counseling before.  I never thought

22  I needed it.  I thought I was smarter.  And I need it.  I want

23  it.  I need it.  I intend to seek it out of my own fruition.

24         And for the victims in the courtroom, I apologize.

25  I stood by and watched while actions were taken that hurt you.

20

1    And for this, I'm sorry.

2           That's all, Your Honor.

3           THE COURT:  All right.  There is, as I understand it,

4    a joint motion to approve a consent order of forfeiture; is

5    that correct?

6           MR. BELK:  That is correct, Your Honor.

7           MR. PATE:  Yes, Your Honor.

8           THE COURT:  The proposed order that's been presented

9    to me, as I understand it, has been vetted by both Counsel and

10   the defendant.  There is a blank on my copy on Page 3 where it

11   addresses the amount.

12          That is numbered Paragraph 1 on Page 3?

13          MR. BELK:  Yes, ma'am.

14          THE COURT:  What are -- what is the consent amount

15   that is to be supplied?

16          MR. PATE:  It was our expectation, Your Honor, that

17   it would be the amount of restitution as set forth in the PSR

18   without objection, so I believe 635,000.

19          THE COURT:  All right.  I am inserting that amount

20   and signing the original consent forfeiture.

21          And Counsel and Mr. Garcia, there are blanks for you

22   to sign this as well.

23          One other housekeeping matter.  In my copy of the

24   PSI, in the report, there were photographs.

25          Are these a part of the sentencing hearing?  There

21

1    appears to be a wedding photograph.

2         Mr. Pate?

3         MR. PATE:   Your Honor, we did not submit those.   I

4    believe they came from Probation.

5         THE COURT:   Was that --

6         PROBATION OFFICER SKARUPA:   That's correct,

7    Your Honor, just for Your Honor's view.

8         THE COURT:   All right.   And is there any dispute

9    that that is, in fact, a -- it looks like a wedding picture of

10   Ms. Ransom and the defendant.

11        Is that --

12        MR. PATE:   It is.

13        THE COURT:   -- correct?   All right.

14        But this does not go in the presentence report?

15        PROBATION OFFICER SKARUPA:   Your Honor, it was

16   essentially just like an attachment to the presentence

17   report --

18        THE COURT:   All right.

19        PROBATION OFFICER SKARUPA:   -- so that you could view

20   them.

21        THE COURT:   Any objection to that remaining an

22   attachment on the part of the Government, Mr. Belk?

23        MR. BELK:   No, Your Honor.

24        THE COURT:   On the part of the Defense, Mr. Pate?

25        MR. PATE:   I've not seen that done before,

1   Your Honor, so I'm not sure what the BOP would do with that

2   information.  I suppose we would object because I believe all

3   the facts that they need and the facts that the Court needs for

4   purposes of sentencing are in the PSR.  We'd have no objection

5   to the Court considering it as an exhibit to the sentencing

6   proceeding.

7           THE COURT:  We will mark that as Court's Exhibit 1.

8   It appears to be and is acknowledged to be a picture of

9   Ms. Ransom and the defendant at their wedding.

10          And let me also state for the record that the one

11  victim letter that I was able to read ahead of time was from

12  the Hamblins, Miss Bonnie and Mr. Lee.  And then, of course,

13  I read the other victim's letter as well.  And those will be

14  Court's 2 to this proceeding.

15          All right.  Well, I have, of course, listened to

16  all that was said by both attorneys today and what was said

17  by the defendant himself.  I have studied the presentence

18  investigation report.  I viewed the video that was submitted

19  ahead of time by two of his sons.  I have read each of the

20  letters submitted by the victims.

21          And I thought a long time about all of the factors

22  that are set forth in our federal sentencing statute, 18 U.S.C.

23  Section 3553, and how they apply uniquely to Mr. Garcia.  This

24  is not a case where it is conceivable to depart below the

25  advisory guideline range.  It is a case where it is entirely

conceivable to depart upward given the magnitude of the fraud
involved, the number of the victims that were swindled, the
devastating impact that it's had on their lives.

And all the while, they were defrauded so this
defendant could live a very fancy lifestyle that he in no way
earned: a veritable mansion on Embassy Row in Washington, D.C.;
fancy cars and jewelry and clothes stolen sometimes from an
82-year-old victim who had plans to use that to get something
for their grandchildren.

And you stole it, and you frittered it away in the
most selfish way.

Because of the magnitude of the offense, in looking
at your criminal history, you have earned the very top end of
the advisory guidelines.  And there are only two reasons why
I'm not departing upward.

Number one is you followed the advice of your
counsel to turn yourself in.  Had you not done that, I would
have sentenced you to the statutory maximum.  And the other
reason -- and that goes hand in hand with that one -- is, at
least here today, you were admitting that for most of your
adult life, you've been a fraud and that it has hurt people who
didn't deserve to be hurt.

And what you said at the beginning is a ray of truth,
and that is that people simply won't believe you anymore.  In
this one case, you've defrauded more than a dozen individuals

1   in multiple states of at least $635,000.  You used alias names

2   and identities, advertised fictitious investment plans,

3   provided false representations, all so you could live on

4   Embassy Row, take lavish vacations, buy jewelry.

5           You have five prior fraud convictions.  And as was

6   acknowledged here, only the most recent counted toward your

7   criminal history.  Truth be told, it's hard to find evidence

8   of any legitimate employment you've ever done, and you've long

9   been a grown man.

10          You lied about precious things like military service

11  that you didn't do that other people do.  You lied about

12  special jobs like Navy Seals and CIA that you didn't do that

13  other people did, and you pretended to do that.

14          There is one line that I had focused on as well, and

15  Mr. Belk mentioned it.  In connection with the 1987 District of

16  Columbia case, you describe yourself as a pathological liar who

17  suffers from low self-esteem.  I don't know what will happen

18  to you in the future, but, if you can sustain those moments of

19  clarity, you have the possibility of becoming something else.

20          Based on, really, the cruel nature of the offense

21  and your abysmal history, you are hereby committed to the

22  custody of the Bureau of Prisons to be imprisoned for a term

23  of 37 months.  I strongly recommend to the Bureau of Prisons

24  that you be evaluated for participation in a program of

25  mental health and a program of substance abuse treatment and

1    counseling during your term of incarceration.

2            Restitution is due in the amount of $635,000 to the

3    victims that are identified in the presentence investigative

4    report, and that restitution shall be paid jointly and

5    severally with Karen Kay Ransom.

6            And has the partial payment -- the $88,000, has that

7    already been --

8            MR. BELK:  That has not occurred as of yet,

9    Your Honor.  But in speaking with Mr. Pate, I believe the

10   defendant is relinquishing --

11           THE COURT:  I'm sorry.  What?

12           MR. BELK:  I understand the defendant is

13   relinquishing any interest in that towards --

14           THE COURT:  All right.  Is that correct?

15           MR. PATE:  We are.  But the codefendant, I think, has

16   actual custody of the account.

17           THE COURT:  I understand.

18           His present economic circumstances don't permit him

19   to pay that whole amount of restitution immediately, and so,

20   pursuant to federal law, nominal payments of either quarterly

21   installments of a minimum of $25 if working non-UNICOR or a

22   minimum of 50 percent of all monthly earnings if working UNICOR

23   shall be made.

24           And upon release from imprisonment and while on

25   supervised release, nominal payments of a minimum of $200 per

26

1    month shall be made, and those will be made to the clerk of the

2    U.S. District Court for disbursement to the victims.

3            I am not going to order interest or a fine.  I do

4    want his efforts to be concentrated on repaying the victims, to

5    the largest extent possible.  There is a $100 mandatory special

6    assessment which is due immediately.

7            And pursuant to the plea agreement, the consent

8    forfeiture order has been signed.  The defendant shall forfeit

9    a money judgment reflecting the amount of $635,000, said sum

10   constituting or derived from the defendant's instant conduct.

11           Mr. Garcia, upon release from imprisonment, you'll be

12   on supervised release for a period of 3 years.  Really, it's

13   that period that you can either start to show or not whether

14   you can become a different person.  You may have seen the

15   probation officer does not think you can.  I don't necessarily

16   share that opinion.  But it's during that 3 years that we'll

17   see.

18           I'm going to have the probation officer work

19   particularly closely with you because, during the time that you

20   are under federal supervision, you will not defraud another

21   person.  And if you make attempts to do so, you'll be brought

22   before me.

23           Understand?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  While on supervised release, you'll

1  comply with the standard conditions of supervision adopted by

2  the Court and the mandatory ones that are required by federal

3  law.   Those include a prohibition against possession of any

4  firearm or dangerous weapon.   You'll cooperate in the

5  collection of a DNA sample.   You will participate in a program

6  of testing for drug and alcohol abuse.   You'll also participate

7  in a program of mental health treatment.

8         You'll be required to provide the probation officer

9  with access to any requested financial information, and you

10  shall not incur new credit charges or open additional lines of

11  credit without the approval of the probation officer.

12         I'm going to order that you obtain your GED while

13  you're incarcerated.   And if you're unable to do so, then

14  you'll obtain that during your supervised release period.

15         You'll be subject to certain searches as may be

16  ordered.

17         You must inform any employer or prospective employer

18  of your current conviction and supervision status.   You shall

19  not enter into any form of self-employment absent the prior

20  written approval of the probation officer.   You shall not be

21  employed in any fiduciary capacity or any position allowing

22  access to credit or personal information of others unless the

23  probation officer approves that in advance in writing.

24         You shall maintain not more than one financial

25  institution account nor be a signer on a financial institution

28

1   account without the prior approval of the U.S. probation

2   officer.

3           And the probation officer is directed to provide

4   Mr. Garcia with a written set of instructions that governs all

5   of the terms of supervised release.

6           I did accept a plea agreement, and I'm satisfied it

7   adequately reflects the seriousness of the underlying actual

8   offense behavior.  I will reiterate that it is the advice of

9   your counsel and your choice to accept that that saved you from

10  the statutory maximum in this case.

11          In accordance with the plea agreement, Indictment

12  6:14-27 pending in this district is dismissed as it relates to

13  this defendant.

14          Pursuant to the plea agreement, with limited

15  exceptions, you did waive rights conferred by 18 U.S.C. Section

16  3742 to appeal the sentence and waived the right to attack the

17  sentence in any postconviction proceeding.

18          Mr. Pate, you've been furnished with your notice of

19  your postconviction obligation to consult your client.  And if

20  you'll sign that and have Mr. Garcia sign that and file it on

21  the record in this case.

22          MR. PATE:  Yes, Your Honor.

23          THE COURT:  Do you have a request as to where he be

24  placed?

25          MR. PATE:  Your Honor, there's been some discussion

1   about that.  You know, at the time of his arrest, his residence

2   was in Washington, D.C.  Clearly, he really had no ties to D.C.

3   and certainly does not now.  I think it's evident from what we

4   submitted to the Court that his children and his ex-wife have

5   moved back to the New Mexico area, Albuquerque, New Mexico,

6   which is where he's from.  To the extent the Court's willing to

7   do that, I would simply request a facility somewhere on the

8   West Coast that is consistent with his security classification,

9   but we don't have a particular institution we can request.

10          THE COURT:  All right.  And to the extent space and

11  security can accommodate that request, I do recommend that he

12  be placed in a federal institution on the West Coast.

13          Well, sentence has now been pronounced.  Other than

14  any objection which could have heretofore been made, do you now

15  have any objection as to my findings of fact, my conclusions of

16  law, or to the manner in which sentence was pronounced,

17  Mr. Pate?

18          MR. PATE:  No, Your Honor.

19          MR. BELK:  No, Your Honor.

20          THE COURT:  All right.  Mr. Garcia, I remand you back

21  to the custody of the U.S. Marshal, and counsel may be excused.

22          MR. PATE:  Thank you, Your Honor.

23          MR. BELK:  Thank you, Your Honor.

24       (Proceedings concluded at 12:41 p.m.)

25

30

1          C E R T I F I C A T E

2

3          I, Victoria L. Root, Certified Court Reporter, in and for

4     the United States District Court for the Southern District of

5     Georgia, do hereby certify that, pursuant to Section 753,

6     Title 28, United States Code, the foregoing is a true, correct,

7     and complete transcript of the stenographically reported

8     proceedings held in the above-entitled matter and that the

9     transcript page format is in conformance with the regulations

10    of the Judicial Conference of the United States.

11          WITNESS MY HAND AND SEAL this 16th day of March, 2016.

12

13

14

15

16

17

18

19                                    _____

20                                    VICTORIA L. ROOT, CCR B-1691
                                      United States Court Reporter
21                                    Southern District of Georgia
                                      Savannah Division

22

23

24    Post Office Box 10552
      Savannah, Georgia  31412
25    (912) 650-4066